He did it perfectly. We welcome you here to the Court today, and lest I forget, sitting to my left, your right, is Judge Fernando Rodriguez from the Southern District of Texas, who has consented to help us out this week, and we greatly appreciate it. We only . . . we have interesting cases on the docket here, but we do appreciate if you'll keep to the time schedules, which I'm sure you're familiar with, but basically, the yellow light gives you two more minutes. When the red light comes on, please conclude your presentation, unless you're answering a question from the Court, and then we also very much appreciate record citations, when you can furnish those. So the first case this morning is No. 2410929, Miller v. Federal Crop Insurance. We'll hear from Mr. Ballard. Now, I'll have to preface this by saying that although my father grew up on a farm, that was a long time ago, and I don't know anything about peanut and cotton farming, because they were cattle, so you need to start with the nitty-gritty stuff for us. I certainly will, and I'll do that. May it please the Court, Grant Ballard, on behalf of Appellant Derrick Miller, today we're here on an appeal of a good farming practice determination. Congress established the Federal Crop Insurance Program, where private crop insurance companies, insurance providers, provide insurance against natural losses to growing crops. Obviously, losses that are a result of a failure to use good farming practices are not insured losses. In this case, I'll briefly hit the facts before I highlight the issues. The facts are that in 2021, my client, Appellant Derrick Miller, planted over 3,000 acres of cotton and peanuts in Gaines and Yocum Counties, Texas. Where's Yocum County? West Texas. We're in the high plains of West Texas. That's not near Yocum, Texas, so that's what confused me. OK, I'm not familiar with Yocum. Well, Yocum is near Sinton, which is near Corpus Christi, where my dad grew up in Sinton. Certainly, so a long ways from Corpus Christi. Right. And I don't think there's any dispute in the record that my client's crops, they suffered from natural causes of loss. High winds, a wet spring, winds so severe that it blew over some of my client's center pivot irrigation units. You may have seen them where they walk across the field in big circles. The winds were so severe in 2021, it blew some of them over. So my client, asserting that his yields were adversely impacted, submitted crop insurance claims. His private insurance company sent out adjusters who also did a growing season inspection. The adjusters that viewed my client's crop during the crop year, they said that my client's crop was comparable to others in the area. They said that my client met irrigation requirements and crop rotation requirements. And in fact, producers in these counties submitted over 200 crop insurance claims, citing wind, heat, excess moisture. So my client's claims were not out of the ordinary for the counties. Yet my client's claims were denied. There were a lot of criticisms in the record, but the defendant agency, the agency operates the Federal Crop Insurance Corporation, opted to step in and render a good farming practices determination, wherein the defendant agency, the agency said that the cotton weed control was not satisfactory and peanut irrigation and peanut weed control was not satisfactory. So my client, in turn, gets two experts from his area. Dr. Justin Tuggle and Jeff Cooper, ag extension agent for Texas A&M, unpaid witnesses, to come in and look at his practices and tender opinions to the defendant agency that Derrick Miller did, in fact, use good farming practices. RMA, the defendant agency, disregarded these expert affidavits and letters, finding them not credible. I think it's interesting in the record that a United States government agency finds Texas A&M professionals not credible. And, in fact, RMA upheld its own good farming practices determination adverse to my client. So those are the facts that I think are undisputed in the record. The issue is this. This is not a case where I ask the court to resolve a dispute between experts. This case is rather a controversy that gives this court the opportunity to answer the question of whether the agency will be required to follow its own policy and procedures, and whether the agency, the risk management agency of USDA, will be required to follow the law. I see three primary issues from the appellant's perspective. One, can the agency simply ignore expert reports and expert opinions because it deems them not credible? Mr. Ballard, let me . . . go ahead. On that issue, you used the word ignore. The decision, the determination itself, references the experts. One reading also is that the determination considered those experts' opinions but simply found them less credible than other sources on which it relied. I'm not sure if ignored is the appropriate word. Why do you believe that the determination completely ignored Mr. Tuggle and Mr. Cooper? I think that the determination ignores them because they don't give any meaningful discussion to the conclusions of those experts. I think that it follows a Supreme Court case, the National Labor Relations Board v. Walton manufacturing case that I cited, 369 U.S. 404, where two of your sister circuits, the 7th and the 11th, have held that if an agency is going to deem an expert opinion as not credible, they have to have some kind of coherent explanation for a credibility determination. They had some contrary expert opinions, didn't they? They had competing expert opinions. That is correct. Competing? Competing expert opinions. You mean they didn't agree with the opinions of the experts that he offered? That is correct. That's correct. My understanding is that when you find yourself in that situation, per the Good Farming Practices Determinations Handbook published by RMA and per their manager's bulletin that RMA published that's in the record, if there is a dispute amongst expert witnesses, RMA's own published policy and procedure says that they're supposed to go through a factor test and to decide is there a genuine dispute. If there is a genuine dispute, their analysis changes. In this case, the reason I say that the agency ignored the experts is because they didn't even go down that path. They admitted, as you pointed out, Judge Graves, that there are competing or contradicting experts, but instead of going through the analysis required by their own published guidance enacted pursuant to their own regulations, they simply determined, they being the defendant agency, that these determinations were not, for lack of better words or the exact words, were not credible. There's no coherent reason for a credibility determination in this case. I would suggest a credibility determination requires a finding that somebody doesn't know what they're talking about, that somebody is biased, that their opinion has no merit, but you don't see that in the Good Farming Practices Determination. Instead, effectively what they say is that the paid experts, Mr. Scott and Mr. Todd, their opinions were more lengthy. The length of an expert opinion cannot be the standard by which this court judges Good Farming Practices Determinations, and I know this court is aware when dealing with an Administrative Procedure Act review, the court's tasked, according to the Fifth Circuit, to make sure that the decisions fall within a zone of reasonableness. So is this reasonable? Is it reasonable, for example, to rely on one cotton expert, Mr. Mark Scott, and disregard two, not one, but two other experts on cotton, which is what happened? I think that's not reasonable. Is it reasonable to rely on expert opinions like the opinions of Scott and Todd that say the weather was fine? They say conditions were ideal for peanuts. Wouldn't the R.E.M. may rely on other things, aside from expert opinions? I mean they had . . . they looked at precipitation-level sources, how much precipitation there was. Some of that wasn't just expert opinions. If it's based on collected information about what actually happened. There wasn't their information separate and independent from what those expert opinions were. They had photographs, season reports. The rainfall estimates that you specifically referenced don't . . . they contradict the expert opinions relied on by the agency. That's the problem. The problem is that the experts relied on by the agency say the weather was fine. When you look at the rainfall data in the record, it says it was excess precipitation May, June, August, September. We know that the wind blew so hard it blew my client's irrigation pivots over. There's a reason that these expert reports are not reasonable that are relied on. They rely on speculation. If you look at the Todd and Scott opinions, they can see they don't even know what the evapotranspiration rate was in 2021. They try to estimate how much water a plant needs. But they use data from prior years. When we know, based on the information in the record, that this was not an average year. We had four months of rainfall in excess of the ten-year average. So I think . . . Is it normal for a couple hundred other farmers in that area to get crop insurance payments? I do not believe so. I don't know. If you ask a farmer what is a normal situation, a farmer will always say there is no normal. I know. Well, yeah. But I don't know what is a norm, but I think that's a very high number of claims from my perspective, from the appellant's perspective. And you note that they don't mention that in their good farming practice determination. And Mr. Ballard, looking at the RMA determination on the issue of cotton, I mean, it quotes from Mr. Tuggle's affidavit at some length, there's a paragraph about it, references the Texas AgriLife publication, and ultimately then finds, based on the specific observational and photographic evidence presented by Mr. Scott and CRS, that it was more credible than the general nature of the reports of Mr. Tuggle and Mr. Cooper. How much more of an explanation do you think the law requires than what's presented here? There seems to be a discussion of the competing positions of the parties, and then a specific basis for the decision to find one side more credible than the other. What do you believe? It has to go, you know, a full paragraph, a full discussion of exactly why he reached that conclusion? I believe there has to be some link between the conclusion, which is no credibility, and the evidence they cite. In this good farming practice determination, the agency effectively says, well, the other report was more detailed because it had photographs, et cetera. What do the photographs show? There has to be some reason to explanation. The photographs, if you look at them close enough, they don't show you anything. They don't show comparable fields. They show damaged fields, and there's no question the crops suffered from wind damage. So I don't think that's a coherent or reasoned explanation just to say, well, we referenced it, but we're not going to give it any credibility. Credibility is a strong determination. It's not that we disagree with your conclusion. It's that you're not credible. Your opinion doesn't have merit. What is that based on? And I see no reasoned explanation of that in the record. I get it if they say, we think that we visited with three experts, and these two experts, you know, y'all are the outliers. If there was some kind of reasoned explanation like that, that would make sense. But not just, you're not credible. And that's what I think the good farming practice's determination was dismissive. Now, my other primary point is that the agency, in coming to this determination, did not follow their own procedures, which are in the record. The good farming practice's handbook. Federal regulation defines good farming practices. Federal regulation says that's the practices recognized by experts in your area. In your area. Area is defined in federal regulation. It's areas surrounding the insured acres with similar characteristics. Where is that discussion? Instead, in this good farming practice determination, you'll see seeding rates referencing the University of Georgia data. They're using Georgia data for Texas high plains peanuts. That is in contradiction of their own regulatory definitions. Also, this reliance on Mark Scott's opinion that cotton weed control was not satisfactory, per the good farming practice's handbook at record 7790, and per manager's bulletin 05010 at 7795. They only have one expert that opined cotton weed control was not sufficient. They have no supporting publications that say you have to have a pre-planned incorporated herbicide. Their own rules require them to go out and get an additional expert. They didn't do it. They relied on one. They didn't get their additional expert, and they disregarded two competing or contradicting experts. That is arbitrary. And number three, my third point on whether the agency followed its own regulations is simply that when you have competing or contradicting expert opinions, the manager's bulletin that dictates how the agency is supposed to undertake good farming practices decisions says you're supposed to analyze factors to determine if there is a genuine dispute between the experts. That did not happen in here. There was no consideration of factor number one, whether there was an agreement between the experts. There was no consideration of whether other producers in the area used the same practices as my client. So my position is the agency, besides the disagreement, they just departed from the procedure that they published. Did you have any information that compared your client's farming practices to those of the others in the area? The adjusters said that we were comparable. The actual infield adjusters, which were disregarded by the agency, you'll notice the good farming practices determination actually says there was a good growing season inspection, but they don't put the results in the good farming practices determination. The reason the results aren't there is because they were favorable to Mr. Miller. And actually the county ag agent, Jeff Cooper, he said that Mr. Miller's farms in his affidavit looked better than other farms in the area. That wasn't discussed because this fact testimony by Mr. Cooper was not credible. Thank you. All right. You have time for rebuttal. May it please the court. Brian Stoltz on behalf of the appellees. In my time this morning, I would like to make, basically cover three sort of different topics. The first of those is going to be, one, the basic legal framework for what governs the court's analysis here and what governs this program. Talk briefly about that. Two, I'd like to talk about the record, what's in the record, what in our view is in the record that supports the decision here and that supports the result that we request of affirmance. And then third, I'd like to address some of the specific arguments that the appellant has made and explain why those arguments are not ultimately successful. So first, the first kind of big picture legal framework that we're dealing with here, which counsel alluded to, is that we're dealing with a statutorily created crop insurance program that was created by Congress. Part of that congressional mandate is that this crop insurance cannot be used to cover alleged losses where there's been a failure to follow good farming practices. So that is a statutory mandate. That's a statutory requirement. It's in 7 U.S.C. 1508. And the statute actually says that, it uses the words, shall not. In other words, this insurance shall not cover those losses. So we're dealing with an agency that's tasked with carrying out Congress's mandate about what this program can cover and can't cover. The second thing that I think that's relevant about the program is page 18 of the appellant's opening brief correctly states and cites a Supreme Court case called F.C.I.C. v. Merrill. It talks about how these programs are construed as a matter of federal law and that they're strictly construed. And so that's in the appellant's opening brief. I want to sort of flesh out what that means, though. If you look at the Merrill opinion from the Supreme Court that's cited in the appellant's brief, and then also the R&R Farm Enterprises opinion from this court, which is cited in our brief, it both talks about this issue. And it basically explains, tracking back to that Supreme Court opinion, that this crop insurance program was created because private insurers were basically unwilling to get into the business of— This is a Depression-era program, right? It is, Your Honor. That's correct. All right. And we judge this by the substantial evidence rule, don't we? That is correct, as far as I'm concerned.  And, in fact, that Supreme Court opinion that I cited is from the 1940s. Yes, I see that. Right. And then the R&R Farm Enterprises case, though, is from the 1980s when this court looked back to that opinion and basically explained these principles and how they still relate. And I think the key takeaway from that is the Supreme Court explained, and this court echoed, that this is not a normal commercial undertaking where the government has gone into this business to try to make a profit. This is, in a sense, a form of a government benefit, where the government is heavily subsidizing this insurance to try to promote agriculture, which is great. But what that sort of implies and what the Supreme Court said, it is not a situation where the rules of law that are normally applicable to an insurer and an insured relationship and those presumptions that you normally have— We're still looking at substantial evidence. And his claim is that there's not substantial evidence and that the agency did not follow its own regulations. So can you be a little more precise in talking— Absolutely. Yeah. And I just wanted to sort of set the groundwork here that this is not a case where there's, like, presumptions that apply against the agency. In fact, it's the opposite, as you alluded to. We're dealing with substantial evidence standard, a very deferential standard. You know, only if the court finds that there is no rational relationship between the facts found and the result, could this court step in and overturn. So that covers the legal framework. Now I'll talk about the record specifically and specifically why that deferential standard was, in fact, satisfied here. First note about the record is you'll know from the briefs that, you know, we're citing the things that are record page 6,000-something or 7,000-something. So it's a lengthy record. But about 6,500 pages of that record simply consist of essentially a spreadsheet that had weather data in it. And when that spreadsheet was put into PDF format, it took up an enormous amount of pages. So although the record is, you know, 7,500 pages or something like that, the vast, vast majority of that is this single spreadsheet. And so, in fact, you know, what I think the key parts of the record are, which I'll discuss in a minute, it's actually relatively streamlined, notwithstanding the page count. So what are those key parts of the record that, in our view, support affirmance? Well, one is the agency's decision itself. There's another thing about the record is there's e-mail traffic in the record showing where things are transmitted to counsel or back to the agency. And so there's a lot of duplication because attachments appear in e-mails. So there actually are several copies of some of these documents in the record. I'll cite to the ones that we cited in the brief. But the agency's actual determination, which is at page 7468 in the record, that's obviously a key piece of the record to see what the agency did and what it reasoned. And then underlying that determination, I think the sort of key things are the four expert reports, for lack of a better word, or write-ups that were provided by the different parties. So there's two reports that are provided essentially by the insurer. One of those is the Todd Agricultural Consulting Report. That deals with peanuts. That's on page 6982 of the record. Then there's also the Mark Scott Report. It deals with cotton. That's on page 7380 of the record. And then as counsel alluded to, there's also, of course, affidavits from Mr. Tuggle and Mr. Cooper that also appear in the record. Those were supplied by the appellant. And I would say with respect to these experts, all of the experts that were consulted were local people in this area of West Texas that were familiar with the area. Mr. Todd was in the Lubbock area. Mr. Scott was in Slayton, which is a smaller community in that same area. So we're talking about people who are all in this same area, familiar with it. They have the resumes appear in the record, and you have people from Texas A&M or Texas Tech. They all have similar background in that sense. Now, why did the agency find that essentially the explanation for what had happened in this case that was supplied by the two experts, Todd and Scott, why did the agency find that that was more credible? Well, I think reviewing those actual reports is the first thing that I think informs why the agency found those more credible. Those reports, and again, I'm not saying that simply the length of a report dictates whether it's the better one. But if you look at the reports, they're both about 13 or 14 pages, single-spaced. They go into a very detailed analysis. For example, the Todd Agricultural Report, which is on 6982, there's a field-by-field analysis of the different peanut fields that Mr. Miller was cultivating. Each of those analysis talks about observations that were made during the growing season, satellite imagery at different times, and that satellite imagery also appears in the record, so you can actually see the biomass that is being cultivated over time. At what level? At what level, Your Honor? How high above the ground? I don't know the exact height, but from the satellite imagery, you can see multiple crop circles. You might be able to see ten. Well, the point is weeds and irrigation, so are they at such a resolution that you can see weeds and lack of water?  So I think the experts kind of explained that what you can tell is the overall biomass, so that translates into two things. One is how much water are they getting, and then based on the timing of when the biomass appears, you can tell whether it's a weed or the actual crop. So, for example, if it's very early in the growing season where you would not expect to see a large biomass because the peanuts, for example, have not fully grown, but there is a large biomass, that's indicative of weeds. How do you reconcile? Well, maybe you'll get to that later, so go on. Okay. So, again, these are the sort of things that are in the record and that the Todd Agricultural Report, for example, went through in quite detail. What the satellite imagery shows and why, and he explains it. What the PRISM weather data shows and then, you know, what the irrigation issues were. And the irrigation was, with respect to the peanuts, was found to be the biggest factor. And essentially what the Todd report explained is that, you know, Mr. Miller had planted all these fields completely in peanuts. In other words, he used up all the sort of available acreage for peanuts. And neighboring farms had not done that, and instead they'd only planted parts of their field in peanuts. And the reason for this is the lack of water, because most of the water is ground water that has to be pumped up and spread. So, based on how much water was actually available, most farmers in the area had only cultivated parts of their field so that the available water that they had could be adequately used on this. Mr. Miller, according to this expert, the expert said, he simply planted too much crop for the water he had available. So he planted too much, too many acres, and he didn't have enough water to irrigate it. And the expert talks about how, you know, he needed at least four gallons per minute per acre, you know, rate of being able to water it. And the best he could do was something like two and a half. And so these are the sort of very granular observations that the experts made. And then, you know, as I think the court has alluded to already, when the agency made its determination, that determination decision, which is at page 7468 in the record, among others, did go through and explain in specific detail why, you know, what the different reports said, what the, you know, what different publications said, like Texas AgriLife. I mean, these are all cited in the agency decision and says, this is what Texas AgriLife says is a good practice and all that. So the agency talked about all that and covered it, and it's backstopped by the expert reports and by the data. And one last thing on the, you know, if you read the sort of competing reports from Tuggle and Cooper, which are at 7396 in the record, 7464, I believe, is another copy. I mean, they're one page, and they basically say he did adequate farming practices. But there's really not a lot of explanation. I mean, I think if it was in civil litigation and these expert reports were presented, they would very likely get a dauber challenge for just not really explaining. It's more in the nature of Ipsy-Dixit. So all that said, I think reviewing these reports and the underlying data shows that the agency, it was at least a rational within the bounds of the agency's decision making discretion to credit, you know, the reports that it did credit over the ones that it didn't. So that brings me to the sort of third thing I want to talk about, which are some of the arguments that counsel has raised on behalf of Mr. Miller. One of those is he talks about the credibility issue and how the agency said, well, ultimately, after looking at these reports, we just think these reports are more credible than the others. And I think counsel is, you know, with respect, is over-reading what the agency meant when it said more credible. The agency was not saying we think these people are liars, we think they're frauds, anything like that. They just said we think that this is more credible. And I think the context makes clear that the explanation given in these specific reports in this case was more credible. It's nothing more than that, and that's a perfectly sort of logical and natural way for the agency to say it. And I don't think it means anything other than that. I will note that there's been discussion of this Good Farming Practices Handbook and the need for the agency to consider certain factors in basically weighing different reports. Those factors are included on page 7796 of the record, and I'd urge the Court to look at them. And it basically lists out a five or six list of things to be considered in assessing whether there are competing expert reports. And notably, it's an or list, so it's not an exhaustive list where you have to check the box on every one. It's or. It just talks about six things to consider in the disjunctive. And among the things that they basically say need to be considered are things about, you know, basically which opinion appears to be more applicable to this exact situation, which opinion is more generalized and is not as specific. It talks about which one has, you know, the data, the publications that back it up. And one of the factors actually is which one has more overall credibility and reliability. So we would suggest that the agency, in fact, did exactly what the handbook says it was supposed to do in the sense that it did look at these things, consider things like the generalness or the more specific factual development of the reports, and which one was more credible. And so that's not an error. That's, in fact, the agency doing what it was supposed to do. Another thing I'd like to mention. Those factors, I think the first one is whether there is a longstanding agreement among experts in an area. Your argument is that RMA did not necessarily have to consider that particular factor because it's an or and or that it did somehow through the RMA determination. I think it's both. One is they don't have to go through mechanically and do every fact exactly in that way because it's an or. But I think they also did consider it because they did look at things like Texas AgriLife publications that talked about what are the best practices for, you know, for example, crop rotation or for weed management. So they did do that, is my point. But my point is also that it is not a requirement to mechanically recite each of those five things. Well, what do you say about, for instance, in Mr. Cooper's affidavit, it is 47,000 seed per acres is an adequate planting rate in our area given our arid climate and other environmental conditions. It is not necessary or customary for peanut producers to make precautionary application of fungicides. Okay. Doesn't that directly contradict your expert? Well, I will say this. The experts did have different views on, for example, what the correct seeding rate was. We're talking about fungicides. Okay. I know they differed on seeding. Okay, yes. I mean, I think to the extent there was my view of what Tuggle and Cooper said is Tuggle and Cooper basically said he did do adequate fungicide. The other experts essentially... They said it is not necessary or customary for peanut producers to make precautionary applications of fungicides. And I thought one of your experts said you have to use some yellow herb, something or other, before the season starts. There was a yellow herbicide. I believe that was in reference to the cotton. But there was also a thing about peanuts and fungicides. There was. I think in the peanuts, the biggest factor in the peanut thing was the water. That's what the Todd report said. There was talk about how there was no residual herbicide applied. Residual, I believe, meaning after the planting has occurred and the crops are starting to come up. So, no doubt, the experts had different views on this. The agency believed that, you know, one set of views were more credible than the other. That's true. That's absolutely true. And what is your response to the argument by the appellant that the RMA determination has to do a more thorough job of explaining why it chose one size expert that's more credible and more persuasive than another size and that it concludes restatement is insufficient? I mean, I think my argument to that is that the record just doesn't support that that's what happened. I mean, the RMA issued a decision that's in the record. It's six or so pages, single spaced, and it does go through everything and explain it. So it's not they didn't just say yes or no. My view is the record actually shows that they did engage in this analysis. I think that's just essentially a different view of what they actually did, and I think if you actually just look at the report, it shows that they did grapple with these things and they weighed the competing things and they came up with a determination, which was their job. What was the amount of Mr. Miller's plate? I am not sure of that, Your Honor. I know it's in the record somewhere, but I don't know the total amount off the top of my head. One thing I do want to mention, too, is counsel talked about the growing season inspection that was conducted early in the growing season, and counsel said that, you know, that growing season inspection supported Mr. Miller, and I think with respect, that's actually not true. The growing season inspection can be found at page 6617 of the record, and importantly, in that growing season inspection, the inspectors, and this had to do with the peanuts, one of the key questions there is, is there a reasonable expectation that this crop will in fact meet, you know, the expected yield, and the growing season inspection found no to that, and crucially, the growing season inspection occurred in, like, August, and even in August at that time, the growing season inspection said there's not a reasonable expectation he's going to meet the yield. The alleged weather event that according to Mr. Miller destroyed the crop did not occur for two more months, so it was in October that Mr. Miller claimed that there was a loss to the peanut crop due to a wind event in October, but two months prior, the growing season inspection before that event had already found that there was not going to be, you know, he wasn't going to meet his yield. Well, that would go to the amount of insurance, not necessarily to whether you had cut it at all, wouldn't it? Well, no, I think because, in other words, because of all these other issues that did not have to do with weather. Yes, but if that were the only considerate, if that were the only thing. Maybe, I'm not sure about that. I mean, I think the reason that... Well, don't they give a shit. In other words, he obviously harvested something from the crops, right? I assume that. Yes, he did, and in fact... Well, then that's an offset to what the otherwise market value of the full planning would be. I'm not sure. I know that he did harvest something because there's... Well, your insurance doesn't reimburse what the ideal crop... You understand what I'm saying, right? It's just like when you give the... when the company gives you the value of the car after you have an accident, it's minus the fair... You know, it's... I understand. Okay, that's what I'm asking. And I think... Well, my time's up. I appreciate it. Go ahead. No, you can answer. I was gonna say, there is indications in the record, like with the cotton crop, where it compares his yield to neighboring fields, and it's much lower on a per-field basis. So it is clear that he did harvest something, at least for some of the crops, but it was much lower. But what I was saying was, even... even if there was something in the seasonal growing season estimate in August that it would not be a reasonable expectation of whatever the yield is, the crop could have been further damaged by wind in October, right? I understand your point, Your Honor. I think that's... that is correct, that that set of events could occur. I don't want it to occur here, but you're right on that. But the... but your report doesn't really systematize its analysis in that way, I don't think. I think what the report says, I think, is just that the big issue was just that there wasn't adequate water because of his farming practices, and so that's why the crops didn't meet their yield. But the PhD unpaid agronomist said it looked okay to him. That's right, Your Honor. Okay. Thank you. We'd ask the court to affirm I appreciate the time and the extra time. Thank you. Thank you. Mr. Ballard. Thank you. Opposing counsel made the point that the biggest factor in this case is water, and I think that demonstrates the arbitrary nature of the decision-making in this case. As I cited earlier, the administrative record shows that it rained more than it had in 10 years, or more than a 10-year average. It also shows that the wind blew so hard it interrupted my client's irrigation. So if the biggest factor is... With regard to wind damage, wouldn't that be affected by the strength of the plants? In other words, if a plant is weaker because it wasn't properly irrigated or there was inadequate weed control or pest control, which made it weaker than it would otherwise have been, then isn't it more susceptible to wind damage? I don't agree. I think the point is that if the wind blows my client's center pivots over, he can't water. And that's the issue. They're saying, well, you should have watered more. You don't agree that a weaker plant is more susceptible to wind damage than a stronger plant? I don't agree. I just don't agree with that. For example, a drought-stressed plant, well, its roots will tap deeper if it's drought-stressed than one that's had plenty of water, and that will be less susceptible to wind. Basically, the fact of the matter is they complain about irrigation and the agency ignores the fact that the wind blew the irrigation systems over and over. That's arbitrary decision-making. And the agency ignores the fact that failure of irrigation water supply is an ensured cause of loss. We specifically got coverage for that if the irrigation is interrupted by weather conditions. We've also got coverage against weeds if adverse weather conditions have impacted our weed control, which is in the record. These are factors, relevant factors, ignored by the agency. The opposing counsel highlighted this issue that they were satellite imagery that Todd and Scott, the agency experts, relied on. Well, you'll also notice that the agency or the crop insurance company reached out in the record to Dr. Dana Porter at Texas A&M, and she reviewed the satellite. Again, the agency ignores her because she says you can't tell the difference between weeds and crops in the satellite imagery. That's at 71.49. That's the third expert that the agency's ignored, and that's an expert that the defense undertook. So Dr. Dana Porter said the satellite imagery is fluff. Dr. Todd, he admitted at 69.93. He didn't even know the amount of the well capacity on Miller's Farms. I want to be clear. My clients did not only submit expert affidavits. There were also letters at records 76.72 and 76.78. My position in this case is that we have a situation where the agency disregarded relevant factors. The disregard and failure to account for relevant factors is an arbitrary and capricious agency action properly set aside. What did the agency do? Mr. Ballard, the question on these factors that you contend were not considered. The experts, at least some of them, considered, it sounds, some of the farms around there, the other growers. Doesn't that implicitly reference then sort of what the local environment would be and what other in that area, what experts may agree upon in that area? Well, the record, if I understand the question, the record doesn't contain any clear evidence of what the local farms looked like or what they were aside from the adjusters that I referenced earlier that said that they were comparable to Miller's Farms. That's record 66.17. Dr. Dana Porter also said in her written correspondence that the company and the agency, they were comparing dissimilar fields because some of these people had planted small portions of the field. So, you know, I think that the agency has erred in failing to consider the fact that we know there was bad weather that hurt my client's crop. They've ignored the on-the-ground inspectors that said irrigation was fine, damage was comparable, and they've ignored that failure of irrigation, water supply, and weed control are insurable causes of loss. So, in the Good Farming Practices determination, it basically sums itself up saying we think that your failure to irrigate and use these weed control methods were more limiting than these disaster conditions. How did they decide that? There's no expert opinion in the record where somebody told RMA we've considered this terrible weather and these irrigation limitations and farming practices were more limiting than natural damages. It's not there. There is no basis for that. How would you decide that question? What's that? I say, what would you need to decide that question if weed control is an insurable event? Well, first you decide are there adverse weather conditions? That's FAD 239 in the record and I think it's clear. That's when the weeds grow when the rain falls more, huh? That's correct. The weed grows when rain falls and it's clear from the record that rainfall will, you know, delay the timing of herbicide applications. You can't spray chemicals in the rain. Thank you.  Thank you very much. I appreciate it. I would ask that you reverse.